*Mrt.*
*KEB*

# STATE OF LOUISIANA

# COURT OF APPEAL

# FIRST CIRCUIT

## 2025 CJ 0698

## IN RE: TERMINATION OF PARENTAL RIGHTS TO THE MINOR CHILD L.C.T.

*Judgment Rendered:*   DEC 1 1 2025

\* \* \* \* \* \* \* \*

Appealed from the
19th Judicial District Court
In and for the Parish of East Baton Rouge
State of Louisiana
Case No. AD11598

The Honorable Gail Grover, Judge Presiding

\* \* \* \* \* \* \* \*

| | |
|---|---|
| Dwazendra J. Smith<br>Lafayette, Louisiana<br>and<br>Halli Kennerson<br>Opelousas, Louisiana | Counsel for Appellants<br>E.G. and G.G.<br>o/b/o their minor child, T.G. |
| Mark D. Plaisance<br>Marcus J. Plaisance<br>Prairieville, Louisiana<br>and<br>Dean M. Esposito<br>Baton Rouge, Louisiana | Counsel for Appellee<br>St. Elizabeth Foundation |
| Allison J. Sabine<br>Baton Rouge, Louisiana | Counsel for Appellee<br>minor child, L.C.T. |

\* \* \* \* \* \* \* \*

BEFORE: THERIOT, PENZATO, AND BALFOUR, JJ.

*ahp*

Penzato, J. agrees in part, concurs in part and assigns reasons

**THERIOT, J.**

E.G. and G.G., on behalf of their minor child, T.G., appeal the East Baton Rouge Parish Juvenile Court's May 5, 2025 judgment dismissing T.G.'s opposition to the adoption of L.C.T.[1]  For the following reasons, we reverse the May 5, 2025 judgment and remand for further proceedings.

## FACTS AND PROCEDURAL HISTORY

K.T. is the biological mother of L.C.T., who was born on October 13, 2024. On September 25, 2024, K.T. executed a notice of intent to surrender the minor child for adoption to the St. Elizabeth Foundation ("St. Elizabeth"), an agency licensed for the placement of children by the State of Louisiana, and filed the notice in East Baton Rouge Parish Juvenile Court.  In her notice of intent, K.T. pertinently stated:

(1) She is pregnant and is expected to deliver a child on or about October 21, 2024.

(2) The alleged birth father of the child is believed to be [Appellant, T.G.,] who is domiciled [in] Opelousas, Louisiana[.]

(3) To the best of her knowledge, the alleged father: a) has not executed a notarial act of acknowledgement of the child; b) has not admitted his paternity of the child by registering with the [putative] father registry; c) has not had his paternity of this child established by court judgment.

(4) The court in which the act of intent to surrender for adoption is to be filed is East Baton Rouge Parish Juvenile Court located in Baton Rouge, Louisiana, East Baton Rouge Parish. [. . .]

(7) [K.T.] declares that she has been informed and understands that her rights as the parent of the child are not being terminated by execution of this act of intent to surrender for adoption.

(8) [K.T.] declares that she has been informed and understands that this act of intent to surrender for adoption is being executed for the purpose of determining whether the alleged birth father will oppose her plans for surrendering her child for adoption.

---

[1] Pursuant to Uniform Rules, Courts of Appeal, Rule 5-1 and 5-2, we use initials throughout this opinion to protect the identity of the minor children involved in this matter. See **Jupiter v. Jupiter**, 2014-0395 (La. App. 1 Cir. 9/24/14), 154 So.3d 1241, 1241 n.1; **In re C.E.F.**, 2007-0992 (La. App. 1 Cir. 9/14/07), 977 So.2d 1, 1 n.1.

2

(9) Affiant declares that she has been informed and understands that if the alleged father responds by filing a timely written objection, he will receive notice of any motion for hearing to determine his parental rights that she may thereafter file, or of any surrender she may thereafter execute, and will be given notice of a hearing on his opposition, and will be given an opportunity to present evidence to acknowledge his paternity, to demonstrate his fitness as a parent, and to demonstrate his commitment to the child.

K.T. was 14 years old when L.C.T. was born. On October 16, 2024, three days after the birth of L.C.T., K.T. surrendered L.C.T. to St. Elizabeth via voluntary act of surrender for adoption.

On October 18, 2024, T.G. filed an objection to K.T.'s notice of intent to surrender L.C.T. for adoption, claiming to be L.C.T.'s biological father.[2] Like K.T., T.G. was 14 years old when L.C.T. was born.

On October 21, 2024, St. Elizabeth filed a motion to approve K.T.'s voluntary act of surrender and terminate K.T.'s parental rights. This motion was later granted in an order signed by the juvenile court on January 28, 2025.

On December 10, 2024, St. Elizabeth filed a motion for reimbursement pursuant to La. Ch. C. art. 1138(E), requesting that T.G. be ordered to reimburse St. Elizabeth for all costs advanced to K.T. in connection with her pregnancy and delivery of the child if he is able to establish his parental rights such that no adoption may be granted without his consent. St. Elizabeth alleged that it had paid $8,027.37 towards K.T.'s expenses, including living expenses, medical expenses, and expenses related to her pregnancy.

On December 12, 2024, the juvenile court ordered T.G. to submit to a paternity test at a facility mutually agreed upon by the parties and to split the associated costs. The paternity test results revealed T.G. to be the biological father of L.C.T.

---

[2] On the same date, E.G. and G.G., on behalf of T.G., filed an exception of improper venue requesting that the matter be transferred from East Baton Rouge Parish to St. Landry Parish, the parish of T.G. and K.T.'s domicile. The juvenile court took up T.G.'s exception of improper venue on January 17, 2025, and denied the exception.

On December 18, 2024, St. Elizabeth propounded interrogatories, requests for production of documents, and requests for admissions upon T.G. Certain exceptions were heard by the juvenile court on January 17, 2025. At that hearing, St. Elizabeth asserted that it had not yet received responses to its previously-issued discovery requests. At that time, the juvenile court ordered T.G. to respond to St. Elizabeth's discovery requests within ten days.

On January 29, 2025, St. Elizabeth filed a motion for contempt and motion in limine to exclude certain evidence at trial. It alleged that T.G. had not provided his discovery responses despite the juvenile court ordering him to do so within ten days of the January 17, 2025 exception hearing. St. Elizabeth prayed that its requests for admissions be deemed admitted due to T.G.'s failure to respond.

On February 19, 2025, E.G. and G.G., on behalf of T.G., filed a petition for paternity, custody, and ex parte order of custody, requesting that the juvenile court recognize T.G. as L.C.T.'s biological father and grant temporary emergency custody of L.C.T. to T.G. pending a hearing on his opposition to the adoption. Relevantly, T.G. asserted that genetic testing determined him to be the biological father of L.C.T and it would be in L.C.T.'s best interests for T.G. to be awarded sole custody of the child.

On March 3, 2025, the juvenile court appointed attorney Alison J. Sabine, Jr. to represent L.C.T. in these proceedings. On March 6, 2025, St. Elizabeth filed a dilatory exception of prematurity and peremptory exception of no cause of action in response to T.G.'s February 19, 2025 petition for paternity, custody, and ex parte order of custody. A hearing on St. Elizabeth's motion for contempt, motion in limine, and exceptions of no cause of action and prematurity, as well as T.G.'s petition for custody, was set for March 26, 2025. The juvenile court ultimately granted St. Elizabeth's exceptions of no cause of action and prematurity and

4

declined to make any modifications to custody pending a hearing on T.G.'s opposition to the proposed adoption.

Regarding the ongoing discovery issues, St. Elizabeth indicated at the March 26, 2025 hearing that it received untimely discovery responses from T.G. on February 10, 2025. St. Elizabeth further asserted that T.G.'s discovery responses were incomplete and did not include any of the documents requested by St. Elizabeth. St. Elizabeth averred that T.G. supplemented his discovery responses by providing certain documents on March 25, 2025, the day before the hearing. Pertinently, St. Elizabeth prayed that its requests for admissions be deemed admitted due to T.G.'s deficient discovery responses. Following argument, the juvenile court denied this request and further denied St. Elizabeth's motion for contempt.

Following this ruling in open court, St. Elizabeth asserted that T.G.'s answer to one of its interrogatories was non-responsive. Specifically, St. Elizabeth's Interrogatory No. 8 asked T.G. to provide specific information regarding any financial support that he or his family made to K.T. during the pregnancy. T.G.'s response to the interrogatory in question stated, "The family has given [K.T.] money on different occasions." After reviewing the relevant responses, the juvenile court determined that T.G.'s answer to Interrogatory No. 8 was "vague and insufficient to prepare for defense of the statement without further detail." Accordingly, the juvenile court granted St. Elizabeth's motion in limine as to Interrogatory No. 8, struck T.G.'s answer to Interrogatory No. 8, and ordered that T.G. could not present evidence of any payments made to K.T. during the pregnancy.[3]

On April 15, 2025, Mr. Sabine, the attorney appointed to represent L.C.T., filed a memorandum in favor of the adoption on behalf of L.C.T. Mr. Sabine

---

[3] This ruling is not at issue in this appeal.

stated that T.G. has never seen L.C.T. and has no relationship with the child. Mr. Sabine acknowledged T.G.'s assertion that K.T. did not allow him to participate in doctors' visits or provide financial assistance, but further noted that T.G. set forth no evidence indicating that he provided healthcare or paid for any expenses related to the pregnancy. Mr. Sabine also indicated that T.G. had not created a legal acknowledgement of L.C.T. at the Lafayette Parish Clerk of Court's Office or the Louisiana Putative Father Registry. He averred that T.G.'s status as a minor prevents him from obtaining reasonable employment, sufficient shelter, or health insurance for L.C.T. He further asserted that T.G. lacks the emotional maturity to provide guidance and care for L.C.T. Mr. Sabine noted that T.G. relies on his parents for total support and is thus unable to provide an adequate, permanent home for L.C.T. at the present time or in the near future. Mr. Sabine concluded that placing L.C.T. in T.G.'s custody would pose an immediate and substantial threat to L.C.T.'s physical health because T.G. cannot provide for L.C.T.'s emotional, financial, or medical needs.

Trial on T.G.'s opposition to the adoption was held on April 21, 2025. T.G., his parents E.G. and G.G., and two of his siblings testified at the trial.

<u>T.G's Testimony</u>

According to T.G.'s testimony, he was 14 years old when L.C.T. was born and 15 years old at the time of trial.[4] T.G. testified that he lives with his parents, attends school, and intends to get a job when he turns 16. He averred that he dated K.T. for approximately one year and that they broke up in November of 2024. Before and during the pregnancy, T.G. and K.T. attended the same school and saw each other every day.[5]

_____

[4] T.G. turned 15 in December 2024.

[5] As of the date of trial, K.T. no longer attended school with T.G.

T.G. testified that he learned about the pregnancy from K.T.'s sister in late January 2024, after which he informed K.T. that he wanted to be a part of L.C.T.'s life. T.G. testified that he frequently offered assistance to K.T., including offers "every day" to help take care of her expenses, but she declined. He asserts that he asked K.T. what she wanted for the baby, offered to attend doctor's appointments, and wanted to be present at the birth.

Relevantly, T.G. testified that he was not allowed to attend K.T.'s doctor's appointments because K.T.'s mother did not want him present. T.G. averred that K.T.'s mother was against him being part of the child's life and alleged that K.T. and her mother would "block" him from contacting K.T. He further testified that K.T. would not allow him to be a part of the pregnancy because she "hated" him. T.G. testified that he and his mother purchased a crib, diapers, clothes, formula, wipes, baby bottles, and baby powder during the pregnancy, but K.T. declined the items when he tried to give them to her. He testified that he knew where K.T. lived, but did not drop off any money or clothing because K.T. did not want anything from him or want him around.

T.G. further testified that he did not learn that K.T. was surrendering L.C.T. for adoption until he was served with the notice of her intent to surrender. He asserted K.T.'s decision to place L.C.T. for adoption "didn't make any sense" because she and T.G. had made plans for the child and selected a name together (which K.T. did not use). T.G. averred that he was not present at L.C.T.'s birth because K.T. did not inform him that L.C.T. was about to be born.[6] He further testified that K.T. did not notify him of L.C.T.'s birth; instead, T.G. learned of the birth after his attorney contacted his mother.

---

[6] According to T.G., K.T. informed him that she was due in October 2024, but did not mention any specific dates.

T.G. alleged that he tried to contact K.T. once he learned of L.C.T.'s birth, but received no response. T.G. further testified that K.T. and her grandmother visited him at his home in December 2024, after K.T. surrendered L.C.T. for adoption. T.G. testified that K.T. showed him a picture of L.C.T. during that visit.[7]

Further, T.G. acknowledged that he is L.C.T.'s father and testified that he is willing to love, nurture, and spiritually guide L.C.T. T.G. averred that, despite his young age, he is willing and able to raise L.C.T. with assistance from his parents.

Testimony of T.G.'s Family Members

T.G.'s brother testified that T.G. informed him of the pregnancy around the end of January 2024. He asserted that T.G. had "no clue" that K.T. was going to surrender L.C.T. for adoption and wanted to take care of L.C.T. T.G.'s brother also testified that he was willing to help raise L.C.T.

T.G.'s sister testified that she and K.T. were pregnant at the same time and that she frequently communicated with K.T. during the pregnancy. She further testified that she offered to babysit and help K.T. raise L.C.T. She asserted that she had offered to have a joint baby shower with K.T., and K.T. agreed. However, she further testified that neither K.T. nor any of her family members attended the shower despite being invited.

T.G.'s father, E.G., testified that he did not learn of the pregnancy until shortly before L.C.T. was born. He asserted that he is willing and able to assist T.G. in raising L.C.T. and would keep L.C.T. while T.G. was at school. He testified that L.C.T. would sleep in a bassinet they had already purchased and that he and T.G.'s mother would bring L.C.T. to doctor's appointments.

---

[7] Although T.G. testified that K.T. showed him a picture of L.C.T. during the December 2024 visit, he subsequently testified that he did not offer any money or clothing at that time because K.T. had not yet informed him directly that she had given birth. We recognize this conflicting testimony and further note that this visit occurred nearly two months after K.T. had already surrendered L.C.T.

T.G.'s mother, G.G., testified that T.G. informed her of the pregnancy in January 2024. She testified that she met with K.T. and her mother in September or October 2024, shortly before K.T. gave birth. She asserted that, at that time, she told K.T. and her mother to let her know if they needed anything and offered to pay for anything they need. She also testified that she had items for L.C.T. at her house and that she was willing and able to help care for L.C.T.

Motion for Involuntary Dismissal

At the conclusion of T.G.'s presentation of evidence, Mr. Sabine moved for a directed verdict[8] on behalf of L.C.T., arguing that T.G. failed to demonstrate a substantial commitment to his parental responsibilities as required by La. Ch. C. art. 1138. St. Elizabeth joined in Mr. Sabine's motion. In response, T.G. argued that he was willing to provide support to K.T. and L.C.T., but his attempts were thwarted by K.T.

The juvenile court ruled in favor of Mr. Sabine and St. Elizabeth, finding that the evidence warranted a granting of the involuntary dismissal and that K.T. had failed to establish his parental rights. Accordingly, the juvenile court terminated K.T.'s parental rights and freed L.C.T. for adoption.

In oral reasons, the juvenile court indicated that its ruling hinged upon whether T.G. made reasonable attempts to manifest a parental commitment, was thwarted in his efforts, and is now willing and able to assume care of the child. See La. Ch. C. art. 1138(B)(2). The juvenile court questioned whether T.G.'s offers of support, which he asserted were rejected, constituted a reasonable attempt.

---

[8] The record reflects that Mr. Sabine, on behalf of L.C.T., made a motion for a directed verdict, which is appropriate only in a jury trial. See La. C.C.P. art. 1810. Where the case is tried by a judge only, the appropriate remedy for dismissal of the case at this stage is a motion for involuntary dismissal. See La. C.C.P. art. 1672. A misdesignation of the pleading is an error of form over substance; we consider them both the same motion. **Andersen v. Succession of Bergeron**, 2016-0922 (La. App. 1 Cir. 4/12/17), 217 So.3d 1248, 1253 n.8, writ denied, 2017-0760 (La. 9/22/17), 227 So.3d 825.

Referencing **In Interest of E.C.B.**, 29,725 (La. App. 2 Cir. 1/29/97), 691 So.2d 687, 692, the juvenile court found that the efforts of T.G.'s family should be attributed to T.G. The juvenile court acknowledged T.G.'s parents were willing to help raise L.C.T. The juvenile court further noted that T.G., G.G., and T.G.'s two testifying siblings knew of the pregnancy in January 2024, but found that G.G. made no direct offer of support until September or October 2024. Aside from this offer, the juvenile court found that there was no evidence of any reasonable attempts made to support K.T. through her pregnancy. The juvenile court also described a "one time incident" where T.G. and his mother purchased something for the child, but found that the purchase was insufficient to constitute sufficient support.[9]

Regarding other elements of La. Ch. C. art. 1138(B), the juvenile court stated that T.G. had only had a "minimum opportunity" to exercise visitation because the child was only six months old. The juvenile court acknowledged T.G.'s motion for custody wherein he sought to have L.C.T. placed with him pending the outcome of this case, finding the motion for custody to be "significant in showing his efforts to visit with his child." The juvenile court further noted that there was no evidence of T.G. being unfit.

The juvenile court ultimately determined that T.G. failed to prove that he and/or his family made reasonable attempts to financially support K.T. during the pregnancy. In the absence of such reasonable attempts, the juvenile court found that T.G. failed to manifest a parental commitment in accordance with La. Ch. C. art. 1138(B)(2).

---

[9] Regarding St. Elizabeth's motion for reimbursement, the juvenile court noted in oral reasons that neither T.G. nor his family made any payments towards reimbursing St. Elizabeth for the costs associated with K.T.'s pregnancy. Louisiana Children's Code article 1138(E) provides that the court "may" order the alleged or adjudicated father to reimburse the department all or part of the medical expenses incurred for the mother and the child in connection with the birth of the child if the court finds that said father has established his parental rights. At this stage of the proceedings, T.G. has not been ordered to make such payments.

On May 5, 2024, the juvenile court signed a written judgment wherein it granted St. Elizabeth's and Mr. Sabine's oral motions for involuntary dismissal; dismissed T.G.'s opposition to the adoption; terminated T.G.'s parental rights; and certified L.C.T. for placement for adoption. This devolutive appeal by E.G. and G.G., on behalf of T.G., followed.

## ASSIGNMENTS OF ERROR

T.G. assigns the following as error:

(1) The [juvenile] court erred in granting an involuntary dismissal and not ruling that T.G. was willing to provide a substantial commitment to his parental responsibilities of L.C.T., but was thwarted in his efforts by K.T. or her agents[,] and that he is not willing and able to assume legal and physical care of L.C.T.

(2) T.G.'s constitutional rights were violated when the [juvenile court found] that T.G. is not a fit parent [and that it was not in L.C.T.'s] best interest for him to be awarded custody of L.C.T., and [terminated] his parental rights.

## STANDARD OF REVIEW

T.G.'s parental rights were terminated upon the juvenile court's grant of the motions for involuntary dismissal filed by Mr. Sabine, on behalf of L.C.T., and St. Elizabeth. Louisiana Code of Civil Procedure article 1672(B) provides the basis for an involuntary dismissal at the close of a plaintiff's case in a bench trial when the plaintiff has not shown a right to relief based on the facts and law.[10] **Succession of Arseneaux**, 2022-0638 (La. App. 1 Cir. 12/29/22), 360 So.3d 868, 872, writ denied, 2023-00135 (La. 4/4/23), 358 So.3d 873. In a non-jury case, the appropriate standard for the trial court's determination of a motion to dismiss is whether the plaintiff has presented sufficient evidence in its case-in-chief to

---

[10] Louisiana Code of Civil Procedure article 1672(B) states:

B. In an action tried by the court without a jury, after the plaintiff has completed the presentation of his evidence, any party, without waiving his right to offer evidence in the event the motion is not granted, may move for a dismissal of the action as to him on the ground that upon the facts and law, the plaintiff has shown no right to relief. The court may then determine the facts and render judgment against the plaintiff and in favor of the moving party or may decline to render any judgment until the close of all the evidence.

11

establish its claim by a preponderance of the evidence, which means taking the evidence as a whole, the fact or cause sought to be proved is more probable than not. See **White v. Officer X**, 2021-0109 (La. App. 1 Cir. 10/8/21), 331 So.3d 333, 337; **Succession of Arseneaux**, 360 So.3d at 872.

When considering a motion for involuntary dismissal, a plaintiff is entitled to no special inferences in his favor. **Succession of Arseneaux**, 360 So.3d at 872. However, absent circumstances in the record that cast suspicion on the reliability of the testimony and sound reasons for its rejection, uncontroverted evidence should be taken as true to establish a fact for which it is offered. **Id**.

We review a trial court's determination as to whether parental rights should be terminated according to the manifest error standard of review. **In re C.E.B.**, 2014-428 (La. App. 3 Cir. 12/3/14), 161 So.3d 811, 814; see also **In re H.M.M.**, 33,766 (La. App. 2 Cir. 3/7/00), 754 So.2d 425, 427. Likewise, the juvenile court's grant of an involuntary dismissal is subject to the manifest error standard of review. **Succession of Arseneaux**, 360 So.3d at 873.

In order to reverse the juvenile court's grant of involuntary dismissal in this matter, we must find that there is no factual basis for the juvenile court's findings or that the findings are clearly wrong. **Succession of Arseneaux**, 360 So.3d at 873. Even though an appellate court may feel its own evaluations and inferences are more reasonable than the trial court's, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. **White**, 331 So.3d at 337. Moreover, where two permissible views of the evidence exist, the fact finder's choice between them cannot be clearly wrong. **Id**. at 337.

## DISCUSSION

Assignment of Error No. 1

T.G. argues that the juvenile court erred in granting the motions for involuntary dismissal and dismissing his opposition to the adoption. He argues that the juvenile court erred when it failed to find that T.G. was willing to make a substantial commitment to his parental responsibilities but was thwarted in his efforts by K.T. or her agents. T.G. further argues that he is willing and able to assume legal and physical care of L.C.T.

Although an unwed father's biological link to his child does not guarantee him a constitutional stake in his relationship with that child, such a link combined with a substantial parent-child relationship will do so. When an unwed father demonstrates a full commitment to the responsibilities of parenthood and an ability to participate beneficially in the rearing of his child, his interest in personal contact with his child acquires substantial protection under the state and federal due process clauses. **Matter of R.E.**, 1994-2657 (La. 11/9/94), 645 So.2d 205, 207; **In re Applying for Private Adoption C.J.P.**, 54,460 (La. App. 2 Cir. 4/13/22), 337 So.3d 186, 190-91. Under the statutory scheme implementing these principles, the unwed father is afforded notice and a hearing at which he has an opportunity to demonstrate his biological link and substantial relationship with the child. See La. Ch. C. arts. 1130-1143; **Matter of R.E.**, 645 So.2d at 207.

An alleged or adjudicated father or his representative, if applicable, may oppose the adoption of his child by filing a clear and written declaration of intention to oppose the adoption within fifteen days of service of either a notice of filing of surrender or an adoption petition.[11] La. Ch. C. art. 1137(A). Upon receipt of the notice of opposition, the court shall appoint an attorney to represent the

---

[11] It is unclear when T.G. was served with the notice to surrender, but timeliness is not at issue in this case.

13

child. La. Ch. C. art. 1137(B). The court shall set the opposition for contradictory hearing, which hearing shall be held within twenty days of the filing of the opposition. La. Ch. C. art. 1137(C).

The hearing of the unwed father's opposition is addressed in La. Ch. C. art. 1138. Louisiana Children's Code article 1138(A) states:

> A. At the hearing of the opposition, the alleged or adjudicated father must establish his parental rights by acknowledging that he is the father of the child and by proving that he has manifested a substantial commitment to his parental responsibilities and that he is a fit parent of his child.

At the hearing, the unwed father bears the burden of proving, by a preponderance of the evidence, that his parental rights should be recognized.[12] See La. Ch. C. art. 1138; **In re A.S.**, 2015-0762 (La. App. 1 Cir. 9/18/15), 181 So.3d 106, 109. In order to establish his parental rights, La. Ch. C. art. 1138(A) requires that the unwed father (1) acknowledge that he is the father; (2) prove that he has manifested a substantial commitment to his parental responsibilities; and (3) prove that he is a fit parent of his child. **State in Interest of B.B.M.**, 2021-1359 (La. App. 1 Cir. 6/16/22), 2022 WL 2168939 (unreported) at *5, writ denied, 2022-01023 (La. 9/7/22), 345 So.3d 431.

The first requirement of La. Ch. C. Art. 1138 is that the alleged father must "establish his parental rights by acknowledging that he is the father of the child[.]" This requirement is met when the father makes a declaration of paternity in open court. **In re Adoption of A.P.C.**, 2000-1381 (La. App. 5 Cir. 12/13/00), 776 So.2d 567, 577. T.G. made a declaration to this effect at the trial on his opposition to the adoption, thus satisfying this requirement.

---

[12] If the trial court finds that the unwed father has failed to establish his parental rights, La. Ch. C. art. 1138(D) directs the trial court to decree that the father's rights are terminated; if the unwed father successfully establishes his parental rights, La. Ch. C. art. 1138(E) directs the court to declare that no adoption may be granted without his consent. **State in Interest of B.B.M.**, 2021-1359 (La. App. 1 Cir. 6/16/22), 2022 WL 2168939 (unreported) at *5, writ denied, 2022-01023 (La. 9/7/22), 345 So.3d 431.

The next criteria under La. Ch. C. art. 1138(A) is that the father must prove that he has "manifested a substantial commitment to his parental responsibilities." **In re Adoption of A.P.C.**, 776 So.2d at 578. Explanation of how a father proves his substantial commitment is outlined in La. Ch. C. art. 1138(B), which sets forth the unwed father's burden of proof:

> B. Proof of the father's substantial commitment to his parental responsibilities requires a showing, in accordance with his means and knowledge of the mother's pregnancy or the child's birth, that he either:
>
> > (1) Provided financial support, including but not limited to the payment of consistent support to the mother during her pregnancy, contributions to the payment of the medical expenses of pregnancy and birth, or contributions of consistent support of the child after birth; that he frequently and consistently visited the child after birth; and that he is now willing and able to assume legal and physical care of the child.
> >
> > (2) Was willing to provide such support and to visit the child and that he made reasonable attempts to manifest such a parental commitment, but was thwarted in his efforts by the mother or her agents, and that he is now willing and able to assume legal and physical care of the child.

See **In re Adoption of EHM**, 2000-2705 (La. App. 1 Cir. 12/15/00), 808 So.2d 397, 404.

Louisiana Children's Code article 1138(B) sets forth in detail what must be shown to prove a substantial commitment to parental responsibilities. **In re Adoption of A.P.C.**, 776 So.2d at 578. The father must show that he provided financial support, including but not limited to the payment of medical expenses of the pregnancy and birth, or contributions of consistent support after birth. **Id**. Pursuant to La. Ch. C. art. 1138(B)(2), if the support was not provided, the father must show that he was willing to provide such support and made reasonable attempts to manifest such parental commitment, but was thwarted in his efforts by the mother or her agents. **In re Adoption of A.P.C.**, 776 So.2d at 578. Substantial commitment and parental fitness are factual findings that are entitled to deference

15

unless the trial court is clearly wrong. **In re Adoption of J.L.G.**, 2001-0269 (La. App. 1 Cir. 2/21/01), 808 So.2d 491, 498.

T.G.'s arguments in this case arise under La. Ch. C. art. 1138(B)(2). At trial, T.G. testified that he never doubted that he was L.C.T.'s father and that he informed K.T. that he wanted to be a part of L.C.T.'s life. He testified that he frequently offered assistance to K.T. at school, including daily offers to help take care of her expenses, but K.T. declined assistance. T.G. also testified that he and his mother, G.G., purchased a crib, diapers, clothes, formula, wipes, baby bottles, and baby powder during the pregnancy, which K.T. also declined to accept.

Insofar as G.G. paid for the items listed above, we observe that the juvenile court found that the efforts of T.G.'s family should be attributed to T.G., a finding based on **In Interest of E.C.B.**, 691 So.2d 687. In that case, an 18-year-old father, Jason, received notice that the 16-year-old mother of his child intended to surrender the child, E.C.B., for adoption. **In Interest of E.C.B.**, 691 So.2d at 688-89. At trial on Jason's opposition to the proposed adoption, Jason's father – E.C.B.'s paternal grandfather – testified that he would financially support Jason and E.C.B. until Jason graduated from college. **Id.** at 689. In the meantime, Jason, then a college freshman and baseball player, planned to quit the baseball team and get a job to help support the child. **Id.** at 689, 692. The trial court ultimately terminated Jason's parental rights, however, on appeal, the Second Circuit reversed and declared that no adoption could take place without Jason's consent. **Id.** at 692. In so finding, the Second Circuit concluded that "older family members should be commended for their efforts to assist and advise an 18-year-old adult to assume responsibility for a child he has fathered out of wedlock." **Id.**

Applying the trial court's reasoning in **In Interest of E.C.B.**, 691 So.2d 687, 691, the juvenile court in the instant case found that willing contributions of the

16

adults responsible for a minor should be attributed to the minor. Consequently, the juvenile court attributed T.G.'s family members' contributions to T.G.

The testimony of T.G.'s mother and sister evidences their own offers of support. T.G.'s sister, who was pregnant during the same time frame as K.T., testified that she offered to have a joint baby shower with K.T. She alleged that K.T. initially agreed to the joint baby shower, but neither K.T. nor any of her family members attended. T.G.'s mother, G.G., testified that she met with K.T. and her mother in September or October 2024, whereupon G.G. instructed K.T. and her mother to let her know if they needed anything and offered to pay for anything they needed. G.G. also testified that she had personally purchased items for L.C.T.

T.G.'s opposition to the adoption was dismissed following the juvenile court's grant of Mr. Sabine's and St. Elizabeth's motions for involuntary dismissal. In determining whether involuntary dismissal should be granted, the appropriate standard is whether a party has presented sufficient evidence to establish a claim by a preponderance of the evidence, which means taking the evidence as a whole, the fact or cause sought to be proved is more probable than not. **Succession of Arseneaux**, 360 So.3d at 872, citing **In re Fogg**, 2019-0719 (La. App. 1 Cir. 2/21/20), 298 So.3d 291, 293, writ denied, 2020-00819 (La. 10/14/20), 302 So.3d 1124. Absent circumstances in the record that cast suspicion on the reliability of the testimony and sound reasons for its rejection, uncontroverted evidence should be taken as true to establish a fact for which it is offered. **Succession of Arseneaux**, 360 So.3d at 872. Importantly, the testimony of T.G., his parents, and his siblings was not controverted, nor did the juvenile court reveal any suspicion as to the reliability of their testimony. Thus, at this stage of the proceedings, this Court must take the testimony relating to the offers of support as true.

17

The next question is whether T.G.'s offers of support constitute a reasonable attempt to manifest a parental commitment. Several cases are helpful in making this determination. In the case **In re Adoption of J.L.G.**, 808 So.2d 491, 494-95, this Court reversed the lower court's finding that a father, TJT, had provided support for his child, JLG. This Court found that it was undisputed that TJT provided no financial support to JLG's mother during the pregnancy, paid no medical expenses for the mother or JLG, and provided no cash, diapers, formula, or other items for JLG after she was born. **In Re Adoption of J.L.G.**, 808 So.2d at 494. TJT argued that JLG's mother never requested support from him, whereupon this Court explained that La. Ch. C. art. 1138 does not refer to providing support "if requested." **Id**. at 495. Notably, JLG's mother testified that she did not ask for support because to have done so would have been a vain and useless act. **Id**. This Court concluded that the trial court was clearly wrong in finding that TJT had proven a substantial commitment to parenting when there was no evidence in the record that he had provided meaningful financial support or had visited the child frequently and consistently. **Id**. at 499.

In the Second Circuit case **In re Applying for Private Adoption C.J.P.**, 337 So.3d at 188, Mr. Green filed an opposition to the private adoption of his minor child, C.J.P. Similar to the mother in **In re Adoption of J.L.G.**, 808 So.2d 491, C.J.P.'s mother testified that she did not believe that Mr. Green would follow through on offers to provide financial support. **In re Applying for Private Adoption C.J.P.**, 337 So.3d at 194. C.J.P.'s mother also testified that Mr. Green offered her $2,000.00 not to go through with the pending adoption. **Id**. at 189. She believed that this offer was not about keeping the baby; rather, it was about Mr. Green keeping her. **Id**. at 189-90. Mr. Green otherwise only offered money to C.J.P.'s mother for maternity clothes. **Id**. at 193. C.J.P.'s mother refused this offer and requested help for necessary living expenses instead, a request that Mr. Green

did not respond to. **Id.** at 190. Aside from these two offers, Mr. Green did not provide any funds to help the mother or C.J.P.'s prenatal care or other expenses, nor did he actually give C.J.P.'s mother any money. **Id.** at 190, 193. The Second Circuit affirmed the trial court's judgment terminating Mr. Green's parental rights, finding his case to be analogous to **In re Adoption of J.L.G.**, 808 So.2d 491. **Id.** at 194.

In **Doe v. A.B.**, 2006-1226 (La. App. 3 Cir. 1/31/07), 949 So.2d 602, the Third Circuit considered the appeal of a child's prospective parents, which challenged the trial court's finding that an eighteen-year old father, A.B., had been thwarted in his efforts to assume legal and physical care of his child, Baby D. Relevantly, Baby D's biological mother testified that A.B. did not offer any help or offer to pay any expenses of her pregnancy. **Doe v. A.B.**, 949 So.2d at 606-07. The Third Circuit reversed the trial court's ruling, finding that there was no evidence showing that A.B. made any reasonable attempts to manifest a substantial commitment to parenting Baby D, nor was there any evidence of A.B. having provided financial support to Baby D's mother. **Id.** at 608.

In each of these three cases, the mothers of the children at issue testified about their child's father's failure to manifest his substantial commitment to parenting the child. Conversely, our decision is primarily based upon T.G.'s uncontroverted testimony, which we must take as true to establish the fact for which it is offered, *i.e.* to establish that T.G. made frequent offers of support. See **Succession of Arseneaux**, 360 So.3d at 872. At this stage of the proceedings, no evidence has been presented to rebut T.G.'s assertions that he repeatedly offered support but was denied.[13] Therefore, we find that the trial court erred in granting

---

[13] Louisiana Children's Code article 1138(C) provides that the child, the mother, and the legal custodian may offer rebuttal evidence to the unwed father's opposition; however, this rebuttal evidence is limited to the issues enumerated in La. Ch. C. art. 1138(A) and (B).

the motions for involuntary dismissal filed by Mr. Sabine, on behalf of L.C.T., and St. Elizabeth.

Louisiana Children's Code article 1138 does not refer to providing support "if requested," and this Court has expressed that a "father who is committed to his parental responsibilities will offer support to his child without being asked." See **In re Adoption of J.L.G.**, 808 So.2d at 495. T.G. testified that K.T. consistently refused his offers and "blocked" him from contacting her. T.G.'s uncontroverted testimony taken as true establishes that he regularly offered support and was repeatedly rebuffed. Such uncontroverted testimony is sufficient to overcome a motion of involuntary dismissal.

We briefly address the remaining factors necessary to prove substantial commitment and fitness, which relate to visitation and the unwed father's ability to care for the child. See **In re Adoption of J.L.G.**, 808 So.2d at 493, citing La. Ch. C. art. 1138(B). Regarding visitation, the juvenile court found that T.G.'s February 19, 2025 petition seeking custody of L.C.T. is "significant in showing his efforts to visit with his child." We agree with this finding by the juvenile court.

As to T.G.'s ability to take care of his child, he testified that he planned to get a job upon turning 16 in order to help support L.C.T. His father, E.G., testified that he was willing and able to assist T.G. in raising L.C.T. and would keep L.C.T. while T.G. was at school. He further testified that he and T.G.'s mother, G.G., would bring L.C.T. to doctor's appointments. Likewise, G.G. testified that she had items for L.C.T. at her house and that she was willing and able to help care for L.C.T. Attributing the efforts of T.G.'s parents to T.G. and without any evidence to the contrary at this point in the proceeding, we cannot say that T.G. lacks the ability to take care of L.C.T.[14]

---

[14] Louisiana Children's Code article 1138(A) requires that a father prove that he has manifested a substantial commitment to his parental responsibilities and that he is a fit parent of his child. Like substantial commitment, parental fitness is a factual finding that is entitled to deference

Considering the evidence as a whole, including T.G.'s uncontroverted testimony, T.G. has presented sufficient evidence to establish that it is more probable than not that T.G. repeatedly offered support to K.T. and she declined those offers. See **Succession of Arseneaux**, 360 So.3d at 872. Because T.G. presented evidence sufficient to defeat the motions for involuntary dismissal raised by Mr. Sabine and St. Elizabeth, we conclude that the trial court's grant of the motions for involuntary dismissal was manifestly erroneous. Accordingly, we reverse the May 5, 2025 judgment and remand this matter for further proceedings in accordance with this opinion.

Assignment of Error No. 2

T.G. argues that his constitutional rights were violated by the juvenile court's failure to rule that he is a fit parent and that it is in L.C.T.'s best interest that T.G. be awarded custody. Relevantly, the juvenile court did not determine T.G. to be unfit.[15] Regardless, T.G.'s second assignment of error is pretermitted by this Court's reversal of the juvenile court's May 5, 2025 judgment.

**DECREE**

For the above and foregoing reasons, we reverse the East Baton Rouge Parish Juvenile Court's May 5, 2025 judgment, which granted motions for involuntary dismissal filed by Allison J. Sabine, Jr., on behalf of the minor child L.C.T., and St. Elizabeth Foundation; dismissed the opposition to the adoption of L.C.T. filed by E.G. and G.G., on behalf of their minor son T.G.; terminated T.G.'s parental rights; and certified L.C.T. for placement for adoption. We remand this

---

unless the trial court is clearly wrong. See **In re Adoption of J.L.G.**, 808 So.2d at 498. The juvenile court stated in oral reasons that T.G. and other parents "start off being fit" and the burden is on St. Elizabeth and Mr. Sabine to show that T.G. is unfit. The juvenile court concluded that there was no evidence of T.G. being unfit such that the fitness prong would be a barrier in the instant case. See **In Interest of E.C.B.**, 691 So.2d at 691 (finding that there was no evidence whatsoever to show that the father was unfit for parental responsibilities). We find no manifest error in this conclusion by the juvenile court.

[15] *Supra* fn. 14.

matter for further proceedings in accordance with this opinion. Costs of the appeal are assessed to Appellee, St. Elizabeth Foundation.

**REVERSED AND REMANDED.**

STATE OF LOUISIANA
COURT OF APPEAL
FIRST CIRCUIT

2025 CJ 0698

**IN RE: TERMINATION OF PARENTAL RIGHTS
TO THE MINOR CHILD L.C.T.**

**PENZATO, J., concurs in part.**

When considering a motion for involuntary dismissal, absent circumstances in the record casting suspicion on the reliability of the testimony and sound reasons for its rejection, uncontroverted evidence should be taken as true to establish a fact for which it is offered. *Succession of Arseneaux*, 2022-0638 (La. App. 1 Cir. 12/29/22), 360 So. 3d 868, 872, writ denied, 2023-00135 (La. 4/4/23), 358 So. 3d 873. Louisiana Children's Code art. 1138 (C) allows the child, the mother of the child, and the legal custodian to offer rebuttal evidence to proof that the father was willing and made reasonable attempts to provide financial support, but was thwarted in his efforts by the mother or her agents. Because the juvenile court granted the involuntary dismissal, Mr. Sabine and St. Elizabeth did not have the opportunity to present such rebuttal evidence. Accordingly, I agree with the majority that the involuntary dismissal was improperly granted, and find the matter should be remanded to allow rebuttal evidence. See *Succession of Arseneaux*, 360 So. 3d at 874.